## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVID LUGO, | ) | |
| | ) | Case No. |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| CHICAGO POLICE OFFICERS | ) | |
| REYNALDO GUEVARA, GERI LYNN | ) | |
| YANOW, as SPECIAL REPRESENTATIVE | ) | |
| of the ESTATE OF ERNEST HALVORSEN, | ) | |
| ANTHONY RICCIO, STEPHEN GAWRYS, | ) | **JURY TRIAL DEMANDED** |
| JAMES HENK, GEORGE FIGUEROA, | ) | |
| UNKNOWN OFFICERS OF THE | ) | |
| CHICAGO POLICE DEPARTMENT, and | ) | |
| THE CITY OF CHICAGO | ) | |
| | ) | |
| *Defendants.* | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, DAVID LUGO, by his attorneys LOEVY & LOEVY, and

complaining of Defendants REYNALDO GUEVARA, GERI LYNN YANOW as SPECIAL

REPRESENTATIVE of the ESTATE OF ERNEST HALVORSEN, ANTHONY RICCIO,

STEPHEN GAWRYS, JAMES HENK, GEORGE FIGUEROA, UNKNOWN OFFICERS OF

THE CHICAGO POLICE DEPARTMENT, and the CITY OF CHICAGO, states as follows:

## INTRODUCTION

1.      In 1991, Plaintiff David Lugo was just 20 years old when he was framed for

murder by disgraced former detective Reynaldo Guevara and his fellow corrupt officers. Mr.

Lugo was sentenced to 50 years and spent the next 24 years behind bars for a crime he did not

commit.

2.      Plaintiff Mr. Lugo had nothing to do with the murder. At all times since Defendants first accused him of the crime, Mr. Lugo has maintained his innocence.

3.      There was not one piece of physical evidence connecting Mr. Lugo to the murder. Mr. Lugo had no motive to commit the crime. In fact, there was never any reason to think Mr. Lugo had any involvement.

4.      Mr. Lugo's connection to the crime was invented by the Chicago Police Department. In carrying out their plot, Detective Guevara and the other Defendants fabricated identifications from the only two witnesses to the murder, and then hid their misconduct from Mr. Lugo.

5.      Plaintiff is one of at least 39 men and women exonerated after being convicted on murder charges arising in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

6.      The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

7.      Cook County courts have found that Defendant Guevara "engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

8.      In court proceedings, Defendants Guevara, his partner Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers. Defendant Guevara has specifically pleaded his Fifth Amendment right not to incriminate himself on multiple occasions in response to

questions about his misconduct as a police officer, including during the investigation that caused Plaintiff's wrongful conviction.

9.      On August 9, 2022, having concluded that convictions obtained by Defendant Guevara cannot stand consistent with due process, Illinois state prosecutors moved to vacate the convictions of eight victims of Defendant Guevara in an unprecedented mass exoneration of murder convictions.

10.     For his part, Plaintiff won the right to present evidence of his innocence in post-conviction proceedings. On July 8, 2022, the court granted his post-conviction petition on the basis of innocence, the charges against Plaintiff were then dismissed, and Plaintiff was awarded a Certificate of Innocence.

11.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the incalculable loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

15.     Plaintiff David Lugo spent 26 years in prison for a crime he did not commit.

16.     At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Anthony Riccio, Stephen Gawrys, James Henk, George Figueroa, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

17.     Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

18.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted at all relevant times as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

19.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

20.     At approximately 6:30 pm on July 19, 1991, sixteen-year-old Michael Velez was riding his bicycle with his friend Julio Sanchez near 3807 W. Palmer, near the intersection of Palmer and Hamlin Avenues in Chicago.

21.     An unknown person, also riding a bicycle, approached the boys and shot Velez repeatedly at 3807 W. Palmer. The offender rode northbound on his bike on Hamlin, then turned eastbound on Lyndale. Neither the offender's bike nor the gun used were recovered.

22.     The main pieces of evidence implicating Mr. Lugo were 1) two eyewitness accounts which were tainted by manipulated photo and lineup identifications, and 2) tenuous "nickname research" conducted by the Defendants which was shown to be untrue at trial.

### Eyewitness Accounts

23.     Chicago Police interviewed two eyewitnesses to the shooting: Efrain Sanchez, who observed a portion of the shooting looking down from a second floor apartment, and Efrain's son Julio Sanchez, who was riding his bike next to Velez during the shooting.

24.     Efrain's view was from a second story window and he only saw the back of the shooter. He was not able to see the shooter's face. He did not know the perpetrator.

25.     Efrain could not describe what the shooter looked like, apart from describing the shooter's race and gender. Efrain had a drug problem and admitted to being under the influence of crack cocaine at the time of the shooting.

26.     For his part, Julio told police he only caught a glimpse of the shooter as he could only see the shooter from the side.

**Initial Leads**

27.     Directly after the shooting, Velez was treated by Paramedic Christopher Wright and transported to Illinois Masonic Hospital. Wright later testified at trial.

28.     Wright stated that Velez was critically injured but conscious during transport. Wright testified that Velez spoke to him through an oxygen mask and identified the assailant as "Malo."

29.     Wright testified that Velez gave no description or real name of the shooter.

30.     Velez was then treated by Dr. Peter Hull at Illinois Masonic Hospital.  Dr. Hull stated that Velez told him he was shot by someone named "Marlow." Dr. Hull insisted the pronunciation of Marlow was very clear. Like in the case of Wright, Dr. Hull stated that Velez did not give a description or real name of the shooter.

31.     Dr. Hull stated that Velez told him that "Marlow" was a Gangster Disciple.

32.     Velez died at the hospital after surgery the same day he was shot. Velez was unable to provide any further information about his killer.

33.     Defendants took this inconsistent information and used it to focus on Mr. Lugo. Defendants focused on Mr. Lugo because he had the common nickname "Malo." Mr. Lugo, however, had nicknames other than "Malo," and was not a Gangster Disciple.

34.     Moreover, the nickname Malo was a common nickname among people living on Chicago's northwest side. Dozens of people, if not hundreds, had that same nickname.

35.     Despite the fact that Mr. Lugo was not a Gangster Disciple and was simply one of many people with the nickname Malo, Defendants Gawrys and Riccio named Mr. Lugo as the suspect in the murder. These Defendants issued a Stop Order for Mr. Lugo, falsely claiming

there was probable cause for his arrest. Defendant Gawrys and Riccio's actions were part of the Defendants' effort to frame Mr. Lugo.

## Efrain's and Julio's Manipulated Photo Identifications

36.     While police were concocting dubious nickname "matches," officers met with eyewitnesses Efrain and Julio and worked to get photo identifications from them.

37.     Efrain and Julio told police multiple times that they saw only glimpses of the shooter.

38.     Efrain could tell the offender was male but could not tell if the offender was dark or light skinned and could not tell the hair color of the offender.

39.     As Chicago Police continued their investigation, Efrain maintained that he did not know the shooter and did not get a good enough look at him to identify him.

40.     Defendants Henk and Figueroa approached Efrain Sanchez and showed him a four photograph array. Mr. Lugo's photo was included in the four photographs.

41.     Efrain told these Defendants that he did not see the offender's face and his head was covered. Nevertheless, Defendants Henk and Figueroa pressured Efrain to make an identification.

42.     While conducting the photo process, Defendants Figueroa and Henk told Efrain that they already knew who the shooter was and wanted Efrain to identify the shooter's picture to be sure.

43.     One of Defendants Figueroa and Henk pointed to Mr. Lugo's photograph in the set. Efrain understood that the officer was suggesting that Efrain choose that person.

44.     Accordingly, Efrain identified Mr. Lugo's photo from the array. After this identification, Defendants Figueroa and Henk told Efrain they wanted "this guy off the street."

45.     Efrain chose Mr. Lugo's photo because, based on the police pointing at it, Efrain believed the police knew who had committed the crime.

46.     Efrain's testimony is corroborated by his son, Julio Sanchez.

47.     Julio only caught a glimpse of the shooter and could only see the shooter from the side.

48.     During the course of the investigation, Julio continued to tell police that he did not get a good look at the shooter.

49.     On September 8, 1991, Julio was celebrating his sixteenth birthday and mourning his friend when officers came to pick him up and bring him to the station. At the time, Julio was high from smoking marijuana, and had drunk more than half of a 40 oz beer.

50.     Julio told the officers that he was intoxicated at the station.

51.     Nevertheless, Defendants Guevara and Halvorsen showed Julio four binders of photos and asked Julio to choose a photo that matched the perpetrator.

52.     When Julio could not pick a photo from the binders, Defendants Guevara and Halvorsen showed Julio four photos and told him to pick a photo from that subset of photos.

53.     The loose photographs were all photographs of Mr. Lugo, taken at different times and depicting him in different clothing and poses.  Julio again told the detectives he could not identify anyone.

54.     Detective Guevara and Detective Halvorsen left for a while, then brought the same subset of photos to Julio again.

55.     At this time, Julio had been at the station for hours and wanted to go home. Based on Defendants Guevara and Halvorsen bringing him the same four photos again, and the fact that they all depicted the same person, Julio knew that these Defendants wanted him to choose Mr.

8

Lugo's photograph. Julio, therefore, chose one of the photos of Mr. Lugo from the array in hopes that he could go home.

56.     Julio had told the officers that he did not see the shooter well enough to make an identification. Julio had also told the officers that he was intoxicated. Regardless of these facts, Defendants Guevara and Halvorsen nevertheless gave him the photos from which to make an identification.

**Physical Lineup Manipulation**

57.     Efrain and Julio's manipulated photo identifications led to lineup identifications of Mr. Lugo. These identifications were also tainted by Defendants' misconduct.

58.     Efrain and Julio were also intoxicated when they made line up identifications.

59.     Efrain Sanchez viewed a lineup at Area 5 on September 8, 1991. The lineup was conducted by Defendants Guevara and Halvorsen.

60.     Mr. Lugo was the only person who appeared in both the July 20, 1991 four photograph array that Defendants Figueroa and Henk showed to Efrain and the September 8, 1991 lineup conducted by Defendants Guevara and Halvorsen. Efrain identified Mr. Lugo as the perpetrator.

61.     In 1992, before Mr. Lugo's trial, Efrain admitted that he was not sure about his identification of Mr. Lugo. Efrain stated that the shooter had been much skinnier than Mr. Lugo.

62.     After the manipulated photo identification from four photos of Mr. Lugo, Defendants Guevara and Halvorsen told Julio that they were going to conduct a lineup.

63.     Defendants Guevara and Halvorsen told Julio to identify the man he had picked from the photographs in the lineup.

64.     Following Defendants Guevara and Halvorsen's direction, Julio chose Mr. Lugo from the lineup.

65.     Julio has consistently confirmed that Mr. Lugo was not the shooter, based on the brief look that Julio got of the shooter while riding bikes with Velez.

66.     Efrain's manipulated lineup identification was used at trial against Mr. Lugo.

67.     Since the 1991 shooting, both Efrain and Julio have consistently recanted. They have stated that their identifications of Mr. Lugo as the shooter were falsely manipulated.

68.     In fact, Julio recanted to prosecutors before Mr. Lugo's trial, telling them how his identification had been procured. Prosecutors never called Julio to testify against Mr. Lugo.

### Plaintiff is Denied a Fair Trial

69.     Prosecutors relied on Efrain's tainted identifications of Mr. Lugo to prove their case.

70.     Defendant Figueroa presented false evidence of nickname research and investigation procedures more fully described above.

71.     Despite his innocence, Mr. Lugo was convicted and sentenced to fifty years of imprisonment.

72.     Without the Defendants' misconduct, Mr. Lugo would never have been charged with, prosecuted for, or convicted of Velez's murder.

### Plaintiff's Exoneration

73.     Mr. Lugo fought hard to prove his innocence. He filed a post-conviction petition *pro se* in the Circuit Court of Cook County.

74.     In court proceedings after Mr. Lugo's wrongful conviction, Defendant Guevara pleaded his Fifth Amendment right not to incriminate himself in response to a question about his

misconduct as a Chicago Police officer, and specifically about his misconduct during the investigation of the Velez murder and Mr. Lugo's criminal case.

75.     At the time of his exoneration, Mr. Lugo had been fighting the false charges against him for more than half his life.

76.     On July 8, 2022, the Cook County Circuit Court vacated Plaintiff's murder conviction.

77.     On August 9, 2022, all charges against him were dismissed.

78.     Subsequently, Mr. Lugo received a Certificate of Innocence.

79.     Without Defendants' fabrication, manufacture, and suppression of evidence, Mr. Lugo never would have been arrested, prosecuted, or convicted.

80.     At no point in time between July 19, 1991 and the present day has there ever been any credible evidence giving rise to probable cause to suspect Mr. Lugo of the murder of Michael Velez.

81.     Plaintiff's whole life was turned upside down by his wrongful arrest for murder without any warning. His young adulthood was entirely consumed by the horror of his wrongful imprisonment.

82.     At the time of Mr. Lugo's wrongful arrest and conviction, he was mourning the recent death of two of his young children. He also had a six month old son whom he wished to support and protect.

83.     Additionally, Mr. Lugo's mother, father, brother, and sister passed away while serving his sentence. Because of his wrongful imprisonment, Mr. Lugo was unable to mourn the loss of his entire immediate family with those closest to him.

84.    Upon leaving prison, Mr. Lugo entered a world without his immediate family as support, without a relationship with his surviving son, and without a career or livelihood.

85.    Defendants' misconduct irreparably impaired Mr. Lugo's ability to enjoy his family, loved ones, a meaningful career, and participation in free society.

### Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution

86.    The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

87.    Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

88.    These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

89.    At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

90.    At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by

intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

91.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

92.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

93.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

94.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

95.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

96.     In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

97.     Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

98.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

99.     For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

14

100.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

101.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

102.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

103.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse

circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

104.    This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

105.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.    The conduct of live lineup, photographic, and other identification procedures.

b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

16

    d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

    e.     The risks of engaging in tunnel vision during investigation.

    f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

106.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

107.    The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

108.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

109.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

110.    As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

111.    As of the filing of this complaint, 39 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

112.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

113.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

114.     Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

115.     A few examples of Defendant Guevara's misconduct include:

a.     Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him."  The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array;

this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.  Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.  In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.  In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

20

e.      Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.      In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.      Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.      After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i.      In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.    In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k.    In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l.    In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

m.    In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder.  After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

22

n.    In 1995, Defendant Guevara coerced Evelyn Diaz into making a false
identification and providing false testimony to the Grand Jury by threatening Diaz
that, if she did not identify Luis Serrano as the shooter, her children would be
taken away by the Department of Children and Family Services.

o.    In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as
the perpetrator even though Figueroa did not see anything. Figueroa identified
Diaz but recanted his identification at trial.

p.    In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false
statement and testifying falsely against Santos Flores at trial. During Ortiz
Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened
that her children would be taken by the Department of Children and Family
Services, called her "the B word," and "raised his hand," saying that he "felt like
smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a
statement that the detectives wrote out for her because she just wanted to "get out
of there."

q.    In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an
eyewitness to a crime, into making a false identification and providing false
testimony. Zaragoza was intimidated by Guevara and identified Ricardo
Rodriguez as the offender because Guevara told him that Rodriguez was the
shooter.

r.    In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra
as the shooter of Noel Andujar, even though Melendez had not seen the shooter
and told Defendant Guevara as much. In addition, Defendant Guevara wrote false

reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

s.    In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

t.    In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

u.    In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

v.   In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

w.   In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

x.   In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

y.   In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area

Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

z.   In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

aa.  In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

bb.  In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

cc.  In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the

26

groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

dd. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ee. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

ff. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

27

gg.    In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

hh.    In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

ii.    In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

28

jj.    In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

kk.    In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

ll.    In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

mm.    In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room.

Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

nn. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

oo. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

pp. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

qq. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

rr. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked

interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

ss.     In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

tt.     In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

uu.     In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

116.    Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

117.     In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

### COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

118.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

119.     As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

120.     In the manner described more fully above, the Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

121.     The Defendants knew this evidence was false.

122.     The Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

123.     In addition, the Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

124.     In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

125.    The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

126.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

127.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

128.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

129.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

130.    In the manner described above, the Defendants individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

131.     In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

132.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

133.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

134.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

135.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

136.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

137.     These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

138.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

139.     As a result of these Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

140.     The misconduct described in this Count by the Defendants was undertaken

pursuant to the policies and practices of the City of Chicago and the Chicago Police Department,

in the manner more fully described below in Count V.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

141.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

142.     In the manner described more fully above, Defendants, acting in concert with

other co-conspirators, known and unknown, reached an agreement among themselves to

fabricate inculpatory evidence and suppress exculpatory evidence in order to detain, prosecute,

and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him

of his constitutional rights.

143.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by

an unlawful means. In addition, these co-conspirators agreed among themselves to protect one

another from liability for depriving Plaintiff of these rights.

144.     In furtherance of their conspiracy, each of these co-conspirators committed overt

acts and were otherwise willful participants in joint activity.

145.     The misconduct described in this Count was objectively unreasonable, was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

146.     As a result of these Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

147. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT V**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

148. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

149. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

150. At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

151. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

36

152.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

153.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

154.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

155.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

156.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

157.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

158.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed

against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

159.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI**
**State Law Claim – Malicious Prosecution**

160.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

161.     In the manner described above, the Defendants individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

162.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

163.     The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when he received a Certificate of Innocence in January 2023.

164.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

165.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

166.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

167.     The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

168.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII
### State Law Claim – Willful and Wanton Conduct

169.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

170.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

171.     Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

172.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Civil Conspiracy

173.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

174.     As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

175.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

176.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

177.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

178.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

179.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

180.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

181.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
## State Law Claim - Indemnification

182.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

183.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

184.     The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

185.     Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

WHEREFORE, Plaintiff DAVID LUGO, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, GERI LYNN YANOW as SPECIAL REPRESENTATIVE of the ESTATE OF ERNEST HALVORSEN, ANTHONY RICCIO, STEPHEN GAWRYS, JAMES HENK, GEORGE FIGUEROA, UNKNOWN OFFICERS OF THE CHICAGO POLICE DEPARTMENT, and the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, DAVID LUGO, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

**DAVID LUGO**

BY:    <u>/s/ Russell Ainsworth</u>
        *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Z. Brown
Lauren Carbajal
Carla Agbiro
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900